UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VENTURE TAPE CORP. )<br><br>      Plaintiff, )<br><br>v. )<br><br>MCGILLS GLASS WAREHOUSE )<br>and DON GALLAGHER )<br><br>      Defendants )<br> ) | Civil Action No.<br>03-CV-11045 (MEL) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR DAMAGES

Plaintiff Venture Tape Corporation ("Venture Tape") prevailed at Summary Judgment on its trademark infringement claims against the Defendants McGills Glass Warehouse ("McGills") and Don Gallagher ("Gallagher"). In accordance with this Court's Summary Judgment Order, Venture Tape is filing this Motion setting forth its damage calculation. In sum, as is proper under the Lanham Act, Venture Tape seeks a portion of McGills' profits during the infringing period, reimbursement for part of Venture Tape's advertising costs expended during the infringing period, costs and attorneys' fees incurred in prosecuting this litigation, and a permanent injunction prohibiting the Defendants from using Venture Tape's trademarks or other similar terms.

### FACTS

**A.    Defendants' Willful Infringement and Concealment of the Same**

The instant litigation involves trademark infringement claims brought by Venture Tape against its competitor, McGills and its owner, Gallagher. Venture Tape is a worldwide manufacturer of specialty

pressure-sensitive adhesive tapes, and offers adhesive products for use within the stained glass industry, including various foil products. (See Summary Judgment Record at Plaintiff's Statement of Undisputed Facts ("SJ Record") at ¶¶ 1-3 ).[1] Defendant McGills also supplies products to the stained glass industry, selling non-Venture Tape adhesive products, including foils, and other products. Id. at ¶ 9. McGills owner, Defendant Gallagher, admits that McGills is a direct competitor of Venture Tape and that McGills does not sell Venture Tape products. Id. at ¶¶ 11-13.

Since its founding in 1980, Venture Tape has spent millions of dollars advertising and promoting its adhesive products under the trademarks "Venture Tape" and "Venture Foil" (hereinafter, the "subject marks").[2] Id. at ¶ 6. In addition to advertising regularly in several leading stained glass industry publications, Venture Tape also maintains a strong presence on the Internet through its ownership and operation of its website, www.venturetape.com, through which it promotes its products, including its foils. Id. at ¶ 6. From 2000 through 2003 alone, Venture Tape spent approximately **$1,186,047.60** in advertising to promote its name, marks and products. (See affidavit

---

[1] In an effort to avoid duplicating information already on file with this Court, the Plaintiff has simply cited the SJ Record rather than reattaching the entire Record.

[2] In order to protect the integrity of its trade name "Venture Tape," and to preserve the goodwill associated with it, Venture Tape obtained two federal trademark registrations on "Venture Tape" in 1990, Registration Nos. 1,579,001 and 1,583,644. (SJ Record at ¶ 5). These registrations give Venture Tape the exclusive, indisputable right to use the mark "Venture Tape" and its derivatives, including "Venture Foil" throughout the United States in connection with, inter alia, the

of Brad Mingels, attached as _Exhibit A_). These efforts and expenditures have attributed to the tremendous popularity and goodwill associated with the subject marks, which have become extremely valuable symbols of Venture Tape with substantial commercial magnetism. (SJ Record at ¶ 8).

In an obvious attempt to capitalize off of Venture Tape's extensive advertising efforts and its popularity and goodwill, in 2000, the Defendants began using the subject marks in connection with McGills' website, www.mcgillsglass.com, to attract potential customers searching for Venture Tape's competing products to McGills' website instead. _Id_. at ¶ 14. Although McGills does not sell Venture Tape products, the Defendants intentionally placed the subject marks directly on a page in McGills' website and deliberately programmed the website so that these terms would be the same color (white) as the webpage background and thus invisible to anyone viewing the website. _Id_. at ¶ 15. In addition, the Defendants purposefully placed the subject marks in the metatags of McGills' website; these metatags are buried within the website's HTML code and therefore are also not visible to anyone viewing the website. _Id_.

By placing the subject marks directly on a page in McGills' website and in the website's metatags, Defendants caused Internet search engines such as Yahoo, Google, MSN, Excite and Alta Vista (collectively, "Internet search engines") to locate McGills' website and list a link to it in a prominent position when Internet users

_____

sale of adhesive products to the stained glass industry. _See_ 15 U.S.C. §§ 1064, 1065.

performed keyword searches that included the subject marks. Id. at ¶ 16. The link to McGills' website would appear several positions before the link to Venture Tape's website, likely causing consumer confusion as to McGills' affiliation (which was none) to Venture Tape and the subject terms. Id. at ¶ 17. Defendants used the subject terms in this manner despite the fact that McGills never requested or received permission to use the subject marks, and never paid Venture Tape any compensation for products it sold through their use. Id. at ¶ 18.

Defendants' misappropriation of Venture Tape's name recognition and goodwill enabled the Defendants to lure customers into McGills' website, which sold non-Venture Tape products, through at least 2003, when Venture Tape discovered the Defendants' misconduct. Id. at ¶ 23. Upon its discovery of the infringing conduct, Venture Tape filed suit in May 2003 to stop McGills' unauthorized and unlawful use of Venture Tape's marks and to prevent McGills' from further profiting from Venture Tape's name recognition and goodwill.[3]

**B.  Defendants' Willful Misconduct Causes Plaintiff's Litigation Costs to Escalate.**

During the litigation, Venture Tape expended over **$186,085.56** in attorneys' fees and **$7,564.75** in costs to enforce its trademark rights

---

[3] Plaintiff's Complaint was in four counts: (1) Trademark Infringement under 15 U.S .C. § 1114(1), section 32 Lanham Act ("Count I"); (2) Unfair Competition under 15 U.S.C. § 1125(a), section 43(a) Lanham Act ("Count II"); (3) False Designation of Origin under 15 U.S.C. § 1125(a), section 43(a) ("Count III"); and (4) dilution under Mass. Gen. Laws ch. 110B, § 12 ("Count IV").

against the Defendants.[4]  (See Affidavit of Jaimie A. McKean, Esq. at ¶¶ 4-7, attached hereto as Exhibit B).  These litigation expenses, however, were escalated as a direct result of egregious misconduct by the Defendants during the litigation aimed at delaying the litigation and causing Plaintiff to incur unnecessary litigation expenses.  The following is a summary of Plaintiff's litigation costs incurred as a result of the Defendants' most outrageous misconduct:

| ¶ No. | Brief Description | Total Fees |
|---|---|---|
| (1) | Legal fees incurred in defense of Defendants' unnecessary Motion for a Protective Order from July 2004 through September 2004.  (See Exhibit B at ¶ 6(k)-(m)). | $6,697.50 |
| (2) | Legal fees incurred in Plaintiff's attempts to resolve the ongoing discovery dispute regarding Defendants' continuous, flagrant refusal to answer Plaintiff's interrogatories or produce documents, including filing and arguing Plaintiff's Motion to Compel, from July 2004 through October 2004.  (See Exhibit B at ¶ 6(k)-(n)). | $14,090.00 |
| (3) | Legal fees incurred by Plaintiff to engage a California attorney for a second time to inspect and copy documents produced by Defendants in California in December 2004 after Defendants unreasonably refused to allow the California attorney to copy the documents during an initial inspection in July 2004.  (See Exhibit B at ¶ 6(t)). | $3,667.67 |
| (4) | Legal fees incurred in defense of Defendants' frivolous Motion for a TRO in January 2005. (See Exhibit B at ¶ 6(q)). | $4,537.50 |
| (5) | Legal fees incurred in Plaintiff's attempts to compel Defendants' to comply with Court's discovery Order from November 2004 through July 2005, including filing and arguing Plaintiff's Motion for Sanctions for Failure to Comply with the Discovery Order.  (See Exhibit B at ¶ 6(o)-(w)). | $10,170.00 |
|  | **Total** | **$39,162.67** |

---

[4] These fees and costs do not include all the expenses incurred by Venture Tape in connection with the instant Motion for Damages.

(1) The Defendants' misconduct began early in the litigation in connection with its filing of a Motion for a Protective Order in July of 2004. Rather than conferring with the Plaintiff in a good faith attempt to come to a mutually acceptable protective order (as required by Local Rules 7.1(A)(2) and 37.1(A)(B)), the Defendants filed an unnecessary Motion for a Protective Order seeking to restrict the use of all material received during discovery, but offered no justification for such an overbroad protective order (in direct violation of Fed. R. Civ. P. 26(c)). (See Docket at item No. 24, attached at Exhibit C).[5] Even after their filing of the Motion, the Defendants still refused to engage in good faith discussions regarding the provisions of their Proposed Order, including refusing to justify any of the provisions of their Order (again violating this Court's rules). (Exhibit C at item No. 27). As a result of the Defendants' clear violations of Court Rules, the Plaintiff was unnecessarily caused to expend substantial time and money in opposing the Defendants' Motion, totaling $6,697.50. (See Exhibit B at ¶ 6(k)-(m)). Ultimately, this Court agreed with the Plaintiff that the Defendants' proposed order was unjustified and denied Defendants' Motion. (Exhibit C at p. 4, Electronic Order dated 9/1/04).

(2) Around the same time as their filing of the needless Motion for a Protective Order, the Defendants began a course of conduct aimed

---

[5] Again, in an effort to avoid duplicating information already on file with this Court, the Plaintiff herein has simply cited to the attached Court Docket when referring to relevant motions, rather than attach

at thwarting the Plaintiff's attempts to conduct reasonable discovery. First, the Defendants failed to timely respond to Plaintiff's discovery requests, prompting Plaintiff's counsel to remind the Defendants of their obligations in multiple letters in July of 2004. (Exhibit C at item No. 29). In response, the Defendants refused to answer the majority of Plaintiff's Interrogatories, failed to produce even a single document in Massachusetts as per the requests, and never responded to multiple requests by the Plaintiff for a discovery conference to resolve these issues. Id. After continued delays by the Defendants, the Defendants finally agreed to allow a California attorney engaged by the Plaintiff (at Plaintiff's sole expense) to inspect and copy the requested documents at the Defendants' place of business in California. Id. Although the Defendants promised to cooperate fully with this inspection by the Plaintiff, such efforts by the Plaintiff to obtain the relevant documents in California ultimately turned out to be nothing more than a waste of time and money. (Exhibit C at item No. 33). Not only did the Defendants refuse to allow Plaintiff's California counsel to copy any of the documents produced, they further denied the Plaintiff access altogether to many more relevant documents, including all of McGills' electronic data and documents regarding McGills' sales. Id. Thereafter, the Defendants continued to refuse to cooperate with Plaintiff's attempts to resolve the ongoing dispute, ultimately forcing the Plaintiff to file a Motion to Compel to obtain the

---

all the relevant motions and exhibits to such motions already filed in this case.

requested discovery, which this Court allowed on October 18, 2004.

(Exhibit C at item Nos. 29 and 34). These efforts by the Plaintiff to

obtain such discovery from the Defendants cost the Plaintiff

$14,090.00 in legal fees. (See Exhibit B at ¶ 6(k)-(n)).

(3)-(4) Defendants' refusal to cooperate with discovery,

however, did not end there. In accordance with the Court's Order on

the Motion to Compel, the Plaintiff, in December 2004, again engaged

the California attorney to inspect and copy documents produced by the

Defendants at McGills' warehouse in California (costing Plaintiff an

additional $3,667.67). (See Exhibit B at ¶ 6(t)). Although the

Defendants produced some documents and allowed Plaintiff's California

representative to copy them, the Defendants then filed a Motion for a

Temporary Restraining Order ("TRO") to prevent Plaintiff's counsel (in

Massachusetts) from viewing the copied documents claiming the

documents concerned irrelevant information. (Exhibit C at item Nos.

35-36). However, Defendants' Motion was baseless because all the

documents copied by the Plaintiff were responsive to the Plaintiff's

document requests, relevant to Plaintiff's trademark and damages

claims and fell squarely within the Court's Order of October 18, 2004.

(Exhibit C at item No. 37). After the Plaintiff incurred an

additional $4,537.50 to oppose Defendants' frivolous Motion for a TRO,

(see Exhibit B at ¶ 6(q)), this Court agreed with the Plaintiff

finding that all the documents copied were relevant and, therefore,

denying the Defendants' frivolous Motion for a TRO in January 2005.

(Exhibit C at item No. 38).

(5)  Even after the TRO Order, which for the second time ordered the Defendants to cooperate with discovery, the Defendants' defiance continued.  For months thereafter, the Defendants still refused to answer interrogatories or produce certain computerized documents concerning McGills' sales during the infringing period despite numerous requests by the Plaintiff, eventually forcing the Plaintiff to again request this Court's assistance to compel the Defendants to comply with the two previous discovery Orders (in the form of its Motion for Sanctions for Failure to Comply with the Discovery Order filed in March 2005).  (Exhibit C at item No. 39).  Only then, after the Plaintiff incurred an addition $10,170.00 in litigation costs as a result of these additional months of uncooperative behavior by the Defendants, did the Defendants finally provide its purported Answers to Plaintiff's Interrogatories and produce documents concerning McGills' sales.  (See Exhibit B at ¶ 6(o)-(w)).

## C.  McGills Sales and Profits while Infringing on Plaintiff's Trademarks.

Most notably missing from the documents the Defendants finally produced to the Plaintiff were breakdowns of McGills' sales and profits related solely to its sales of adhesive products.  The Plaintiff had requested such documents in its Interrogatories, Document Requests and at Defendant Gallagher's deposition, in an effort to establish the portion of McGills' sales attributable to those goods that directly compete with similar goods to that of Venture Tape.  The Defendants, however, continually maintained that no such figures existed. (See Defendant's Responses to Plaintiff's First Set of Interrogatories at Nos. 15-16 ("The defendant does not have and

9

there do not exist records that give a breakdown or summarization of figures relative to this interrogatory").

The only documents produced by the Defendants that summarize McGills' sales and profits were McGills' tax returns, which indicate that McGills was extremely profitable during the time it was infringing on Venture Tape's trademarks (i.e. from 2000-2003). (See McGills' tax returns for the years 2000-2003, attached as Exhibit D). During this infringing period, McGills posted gross sales of **$4,155,644.50** and gross profits of **$1,898,293.10**. Id. The following is a breakdown of McGills' gross sales and profits during these infringing years:

| Year | Gross Sales | Gross Profits |
|------|-------------|---------------|
| 2000 | $949,458.55 | $307,983.18 |
| 2001 | $880,174.03 | $368,070.96 |
| 2002 | $974,738.00 | $431,836.00 |
| 2003 | $1,351,274.00 | $790,403.00 |
| | | |
| TOTAL | $4,155,644.50 | $1,898,293.10 |

The tax returns produced by the Defendants are relevant to the instant Motion and this Court's calculation of damages because the Defendants were unlawfully using the subject marks to attract consumers to its website where it sold all of its products, not just its adhesive products. Thus, in requesting damages in the instant Motion, the Plaintiff will rely on these total sales figures produced by the Defendants during discovery.

**D.** **Summary Judgment Granted for the Plaintiff**

During discovery in the instant litigation, the Defendants admitted virtually every element of trademark infringement, including:

10

(1) wrongfully using Venture Tape's federally registered trademarks, "Venture Tape" and "Venture Foil" without Venture Tape's knowledge or permission; (2) selling similar goods as Venture Tape; (3) directly competing with Venture Tape; and (4) using Venture Tape's trademarks with the intent of benefiting financially from Venture Tape's goodwill. (SJ Record at ¶ 24). As a result, the Plaintiff filed a Motion for Summary Judgment in November 2005.

Because the Defendants admitted their infringement and had no defense to their actions, this Court, on April 10, 2006, concluded that "the defendants' liability in this case is unquestionable", and granted Summary Judgment for the Plaintiff on all counts. (Summary Judgment Decision ("SJ Decision") at 9, attached as Exhibit E). In its ruling, this Court determined that the Defendants' use of the marks was willful in that it was done "with the intent of benefiting from Venture Tape's reputation in the stained glass industry." Id. at 7. As a result, and in accordance with the Court's request in granting Summary Judgment, the Plaintiff is filing the instant Motion to detail its assessment of damages, costs and attorneys' fees caused by the Defendants' deliberate and willful infringement.

### ARGUMENT

The award of damages in trademark infringement, unfair competition and false designation of origin are all governed by Section 35 of the Lanham Act, which provides that a prevailing "plaintiff shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).

Awards based on a defendant's profits may also be adjusted in the court's discretion if the court finds such the award is "inadequate or excessive...." Id. In addition, in "exceptional cases" (i.e. where there is deliberate infringement), the prevailing party may also collect attorneys' fees incurred in prosecuting the suit. Id.; Tamko Roofing Products, Inc. v. Ideal Roofing Co, LTD., 282 F.3d 23, 32 (1st Cir. 2002).

In the instant matter, the Plaintiff Venture Tape was awarded Summary Judgment on all counts due to the Defendants' admitted, deliberate infringement on Plaintiff's trademarks from at least 2000-2003. As a result, the Plaintiff is seeking to recover: (1) an equitable portion of Defendants' profits during the admitted infringing period (2000-2003); (2) a portion of Venture Tape's advertising costs during the infringing period; (3) the costs of the action; and (4) attorneys' fess. As is standard in trademark cases, Venture Tape also requests a permanent injunction prohibiting the Defendants from using Venture Tape's trademarks in any form or combination.

## I. VENTURE TAPE IS ENTITLED TO AN EQUITABLE PORTION OF MCGILLS' PROFITS DURING THE INFRINGING PERIOD.

### A. Justification for an Award of Defendants' Profits.

Pursuant to the Lanham Act, Venture Tape seeks an award of an equitable portion McGills' profits during the time period McGills was unlawfully using Plaintiff's trademarks in connection with the sale of its products on its website (i.e. from 2000 through 2003). 15 U.S.C. § 1117(a). Courts in the First Circuit allow such an award of the infringer's profits where the plaintiff proves infringement by the

defendant, plus makes a showing that the parties' "products directly compete...." Tamko Roofing Products, 282 F.3d at 36. Such an award of profits is justified: "(1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendants; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement." Id. at 36.[6]

An award of an equitable portion of the Defendants' profits is appropriate here because the Plaintiff has made the requisite showings of infringement and direct competition. This Court previously determined that the Plaintiff proved the Defendants' infringement in granting Summary Judgment for the Plaintiff on all counts and ruling that "the defendants' liability in this case is unquestionable." Exhibit E at 9. This Court also confirmed that the Parties are direct competitors, even pointing out that Defendants made numerous admissions to this effect. See id. at 5-6 ("...the defendants admit that Venture Tape and McGills sell similar and directly competing products to the stained glass industry"); id. at 6 ("...at deposition Gallagher testified that the parties are direct competitors"); see also SJ Record at ¶¶ 11-13. As such, the necessary showings of

---

[6] The Plaintiff waived its right to seek actual damages in its Complaint in order to limit the scope of discovery and disputed issues, and therefore is only seeking to recover the Defendants' profits in accordance with the relevant cases. See Burger King Corp. v. Weaver, 169 F.3d 1310, 1321-22 (11th Cir. 1999) (holding actual harm not required element where awarding profits); Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 941 (7th Cir. 1989) (finding district's court's decision to instruct the jury that an award of profits would be appropriate was not an abuse of discretion under the theory of deterrence or unjust enrichment despite the defendant's argument that the plaintiff failed to demonstrate actual damages or actual confusion).

infringement and direct competition have been proven, rendering an award of Defendants' profits appropriate.  See Tamko Roofing Products., 282 F.3d at 37-39 (upholding award of defendant's profits to plaintiff where infringement and direct competition shown).

An award of an equitable portion of the Defendants' profits is also justifiable in this case to prevent any unjust enrichment by the Defendants and to deter any would-be infringers.  Specifically, the Defendants have admitted that they used Venture Tape's trademarks for more than three years, without the Plaintiff's permission and without ever compensating the Plaintiff for their use of Venture Tape's marks. (SJ Record at 18; Exhibit E at 2-3).  As found by this Court, such use by the Defendants was done "with the intent of benefiting from Venture Tape's reputation in the stained glass industry."  (Exhibit E at 7).[7] Such blatant infringement, left unchecked, would not only unjustly enrich the Defendants to the detriment of the Plaintiff and its reputation, it would also serve to promote, not deter, infringers like the Defendants seeking to profit off the use of another's reputation. Thus, the policies of preventing unjust enrichment and promoting deterrence, further support an award of the Defendants' profits in this case.  See Tamko Roofing Products., 282 F.3d at 37-38 (affirming award of defendant's profits where defendants' infringement was

---

[7] Although willfulness is not a requirement for an award of Defendants' profits, this Court's finding that Defendants' acted intentionally suffices for a showing of willfulness.  See Tamko Roofing Products., 282 F.3d at 36, n. 10 (describing willfulness as an act that is done "voluntarily and intentionally"); see also Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 175 (3rd Cir. 2005) (holding willful infringement is not a prerequisite to an accounting of infringer's profits).

intended to divert customers from plaintiff and to trade on goodwill of plaintiff); Banjo Buddies, 399 F.3d at 178 (finding award of profits was proper to prevent defendant from being unjustly enriched and to prevent other would-be infringers; Entrepreneur Media, Inc. v. Smith, 101 Fed. Appx. 212, 214 (9th Cir. 2004) (upholding award of profits "in order to make trademark infringement unprofitable under the rationale of unjust enrichment").

## B.   Amount of Defendants' Profits.

The Lanham Act provides that once the plaintiff has made such a showing of infringement and direct competition, the plaintiff need only prove the defendant's sales; the defendant has the burden to prove any deductions to its sales.  See 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); see also Tamko Roofing Products, 282 F.3d at 37 (recognizing infringer has sole burden to show he gained no benefit from infringement; otherwise plaintiff is entitled to all of the infringer's profits).  According to McGills' tax returns, McGills' sales during the infringing years totaled $4,155,644.50, while its gross profits totaled **$1,898,293.10**.  (See Exhibit D).  Although the Plaintiff attempted to discovery McGills' sales from its competing products (as one measure of damages), the Defendants failed to produce such breakdowns.  Even if they had, however, such figures would not have accurately reflected Defendants' total profit from the infringement because the Defendants used Venture Tape's marks to lure customers to McGills' website where McGills sold all of its goods, not

15

just directly competing one.  As such, the use of McGills' tax returns, which indicate McGills' total sales and profits, is appropriate.

Although the Plaintiff could seek to recovery all of McGills' profits during the infringing period (totaling $1,898,293.10), the Plaintiff merely seeks an equitable portion of such profits, and defers to this Court's discretion as to the appropriate amount of the damage award.  See Tamko Roofing Products, 282 F.3d at 39 (holding award of defendant's entire profits to plaintiff was proper); see also Baker v. Simmons Co., 325 F2d 580, 582 (1st Cir. 1963) (affirming award of defendant's profits based on defendant's gross sales where some of the goods sold by defendant did not compete with those sold by plaintiff).

In the event that such an award of profits is minimal (because the Defendants somehow at this late juncture meet their burden in showing appropriate deductions), the Plaintiff requests that this Court increase the profit award (as is proper under the Lanham Act) because the Defendants undoubtedly profited off of Venture Tape's extensive adverting during the infringing period.  See 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").  While Venture Tape spent **$1,186,047.60** in advertising costs during the infringing period to promote the subject marks and its products under these marks, the Defendants misappropriated the goodwill associated with the

16

marks by using them (at no cost) in connection with their sale of competing products. (See Exhibit A). As such, the Plaintiff requests that the Defendants be ordered to reimburse the Plaintiff for at least a portion of such advertising costs.

In sum, as a result of the Defendants' blatant infringement in using Venture Tape's name and marks to sell McGills' products, Venture Tape seeks an equitable portion of the Defendants' profits during the infringing years, plus reimbursement for at least part of its advertising costs expended during those years.

## II. PLAINTIFF IS ENTITLED TO COSTS IN PROSECUTING THIS CASE.

The Lanham Act provides for the award of costs to the prevailing party in all cases. 15 U.S.C. § 1117(a). In accordance with the explicit terms of the Lanham Act, courts generally award costs to the prevailing party in trademark cases. See Tamko Roofing Products, 282 F.3d at 41 (awarding costs to prevailing plaintiff); VMG Enterprises, Inc., 788 F. Supp. at 663 (same). The instant case should be no different.

Venture Tape prevailed in this action on all counts at the Summary Judgment stage, thereby establishing that the Defendants violated the Lanham Act through their unlawful use of the Plaintiff's trademarks in connection with McGills' website. As a result, Venture Tape is entitled to recover its costs, which total **$7,564.75**. (See Exhibit B at ¶¶ 4-5).

## III. PLAINTIFF IS ENTITLED TO ATTORNEYS' FEES AS A RESULT OF DEFENDANTS' WILLFUL MISCONDUCT.

### A. Justification for Award of Legal Fees

Attorneys' fees are proper in the instant matter due to the Defendants' deliberate and willful infringement of the Plaintiff's trademarks and their outrageous conduct throughout this litigation. Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorneys fees to the prevailing party." 15 U.S.C. § 1117(a). A case may be declared exceptional where the infringing acts are deliberate or willful or where equity requires such an award. Tamko Roofing Products, 282 F.3d at 32. Equity can support award of attorneys' fees to the prevailing plaintiff where the defendant engaged misconduct during the litigation. Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 280-82 (3rd Cir. 2000). Ultimately, courts will consider the "totality of the circumstances" in determining whether to make an award of attorneys' fees. Tamko Roofing Products, 282 F.3d at 33.

In the instant matter, there is no doubt that the Defendants' infringement was deliberate and willful. In choosing the terms to place on McGills' website (and in its metatags), the Defendants made absolutely no effort to use different marks from that of their direct competitor Venture Tape; instead choosing to use Plaintiff's exact marks. See Exhibit E at 5 (holding Defendants "used Venture Tape's exact marks in their metatags and on their website"). In addition, as found by this Court, the Defendants' use of the marks was voluntary and willful, in that it was done with the precise intent to capitalize on Venture Tape's reputation in the stained glass industry. See id.

18

at 7 (holding "[t]he evidence confirms that the Defendants used Venture Tape's marks with the intent of benefiting from Venture Tape's reputation in the stained glass industry").

Defendants' willful, deceptive conduct is further exemplified by their attempts to hide their use of Venture Tape's marks. Defendants' placement of Venture Tape's marks directly on a page within McGills' website and then programming their site so that the marks were not visible by making them the same color (white) as the page's background was a clear fraudulent attempt by the Defendants to conceal their unlawful conduct and to make detection more difficult. Id. The Defendants' use of these marks in this manner despite the fact that the marks were neither descriptive of the goods offered by the Defendants nor did they have any relationship whatsoever to Defendants' business, further demonstrates that the Defendants only motive in appropriating Venture Tape's marks and using them in connection with McGills' website was to trade on Venture Tape's reputation or cause dilution of the marks. Such willful and fraudulent conduct clearly justifies an award of attorneys' fees. See Tamko Roofing Products, 282 F.3d at 33-34 (upholding award of attorneys' fees based on combination of acts by defendant constituting willful behavior, including the defendants' failure to conduct trademark search, its use of a very similar mark to that of plaintiff, the fact that the parties were direct competitors and defendant's continued infringement after receipt of notice of infringement); Schroeder v. Lotito, 747 F.2d 801, 802 (1st Cir. 1984) (affirming award

of attorneys' fees where district court made finding of willful infringement).[8]

Equity further supports an award of attorneys' fees in this case due to the Defendants' egregious misconduct throughout this litigation aimed at delaying the litigation and causing Plaintiff to incur additional litigation expenses. As detailed above, such acts include the Defendants': (1) utter disregard for this Court's Rules in failing to confer with the Plaintiff before filing a needless motion for a protective order, which was denied by this Court; (2) failure to answer interrogatories or produce documents, causing the Plaintiff to incur substantial additional legal fees to compel the Defendants to cooperate; (3) refusal to allow Plaintiff's California counsel to copy documents during an inspection of the documents in July 2004, forcing the Plaintiff to incur additional expenses to engage the California counsel a second time to inspect and copy the documents in December 2004; (4) filing of a baseless motion for a TRO to prevent Plaintiff's counsel from viewing documents even after the Court compelled the Defendants to produce such documents; and (5) refusing to fully comply with the Court's Orders requiring the Defendants to produce all requested discovery, thereby causing the Plaintiff to incur even more legal fees to again compel the Defendants to cooperate with discovery.

---

[8] In addition, there is evidence that the Defendants continued to use Plaintiff's trademarks after Plaintiff brought this lawsuit in connection with McGills' on-line advertising. This continued use despite the instant litigation further supports an award of attorneys' fees in this matter. See VMG Enterprises, Inc. v. F. Quesada & Franco, Inc., 788 F. Supp. 648, 662-63 (D.P.R. 1992) (awarding attorneys' fees where defendant continued infringing conduct after being put on notice of plaintiff's claims).

(See Exhibit B at ¶ (b)-(e), (k)-(w)). These untoward acts by the Defendants during discovery provide further support for an award of attorneys' fees in this case. See Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 280-82 (3rd Cir. 2000) (holding award of attorneys' fees proper, even absent willful infringement, where defendant engaged in misconduct during litigation including delaying discovery and committing other discovery abuses); Malletier v. Lincoln Fantasy, No. 03-2277JAG, 2006 WL 897966, *8 (D.P.R. Mar. 31, 2006) (awarding attorneys' fees and costs of prosecuting case to prevailing plaintiff due to defendant's intentional infringement and its tactics in litigation, including obstructing discovery and ignoring the court's orders).[9]

## B. Amount of Legal Fees

As a result of the Defendants' willful misconduct, the Plaintiff seeks reimbursement for all its legal fees incurred as a result of Plaintiff's efforts to enforce its trademark rights, totaling more than $186,085.56. (See Exhibit B at ¶¶ 6-7). The First Circuit has recognized the importance of promoting the enforcement of trademark rights by awarding legal fees. Tamko Roofing Products, 282 F.3d at 34 (citation omitted). More specifically, the First Circuit has stated:

---

[9] See also TE-TA-MA Truth Foundation-Family of URI, Inc. v. World, 392 F.3d 248, 263-64 (7th Cir. 2004) (holding infringer's oppressive litigation conduct aimed at driving up litigation costs qualified case as exceptional, and therefore justified an award of legal fees to trademark holder); Guess?, Inc. v. Gold Center Jewelry, 997 F. Supp. 409, 412 (S.D.N.Y. 1998) (awarding attorneys' fees under Lanham Act where "defendant's conduct with respect to the litigation has caused needless expense for the plaintiff and unnecessarily consumed a great deal of the Court's time").

the legislative intent [in allowing the award of attorneys' fees] was partly to encourage the enforcement of trademark rights in cases where 'the measurable damages are nominal' .... When a trademark is infringed, trademark owners have more at stake than just the damages or loss of profits in that case. Their failure to enforce their rights may result in the weakening of these rights over time.... The cost of enforcing the rights may well be larger than the lost profits in any particular case.

Id. (internal citations omitted). As a result, Venture Tape seeks reimbursement for all its legal fees incurred in this suit through which Venture Tape has sought to enforce its trademark rights against the Defendants, totaling more than **$186,085.56**. See id. (upholding award of all of plaintiff's attorneys' fees).[10]

## IV. DEFENDANTS SHOULD BE PERMANENTLY ENJOINED FROM USING PLAINTIFF'S TRADEMARKS.

In addition to damages, costs and attorneys' fees, Plaintiff also seeks a permanent injunction enjoining Defendants from using Venture Tape's trademarks, "Venture Tape" and "Venture Foil", or any other similar terms. Under Section 34 of the Lanham Act, a plaintiff is entitled to a permanent injunction upon a showing of infringement to prevent any future violations by the defendant of its trademark rights. Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 35 (1st Cir. 1989). Such injunctions should be designed to "keep a proven infringer safely away from the perimeter of future infringement." See Tamko Roofing Products, 282 F.3d at 40 (citation omitted).

---

[10] Any claim by the Defendants of hardship should not support a reduction in the award of attorneys fees. See The New York State Society of Certified Public Accountants v. Eric Louis Assocs., Inc., 79 F. Supp.2d 331, 356 (S.D.N.Y. 1999) (ordering defendants to pay plaintiff's attorneys fees even though award would "impose a tremendous hardship on Defendant" because "failure to grant significant attorneys fees in a case such as this would only encourage others to pursue the course charted by Defendant").

Here, this Court ruled that the Defendants have engaged in intentional infringement of Venture Tape's trademarks. (See Exhibit E at 7). Thus, there is no question as to liability. Therefore, the Defendants should be permanently enjoined from using, disseminating, reproducing, promoting, distributing, or otherwise benefiting from any of Venture Tape's trademarks, in any form or combination, or any other similar mark. See Tamko Roofing Products, 282 F.3d at 40 (issuing permanent injunction prohibiting defendants from using plaintiff's trademark or any similar abbreviations of the mark); Boston Athletic Ass'n, 867 F.2d at 35 (granting summary judgment for plaintiff on trademark claims and issuing permanent injunction against defendant); Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 48 (D. Mass. 1995) (same).[11]

### CONCLUSION

WHEREFORE, for the foregoing reasons, Venture Tape respectfully requests that this Court (1) award it an equitable portion of the Defendants' profits (which total $1,898,293.10) during the infringing period; (2) reimburse the Plaintiff for a portion of its advertising costs (which total $1,186,047.60); (3) award it its costs in prosecuting this case, totaling **$7,564.75**; (4) allow it to recover its attorneys fees in this action, totaling **$186,085.56** (plus additional

---

[11] In addition to Count I-III under the Lanham Act, Summary Judgment was also granted for the Plaintiff on Count IV of the Complaint, which is a dilution claim under Mass. Gen. Law ch. 110B § 11. (See Exhibit E at 9-11). The proper remedy for such a violation of the Massachusetts anti-dilution statute is a permanent injunction. See Mass. Gen. Laws ch. 110B, § 12 (violation of statute constitutes grounds for injunctive relief).

attorneys' fees incurred in relation to the instant motion); and (5) enjoin the Defendants' from any further use of Plaintiff's trademarks, including "Venture Tape", "Venture Foil" or any similar terms, in any form or combination.

**THE PLAINTIFF REQUESTS A HEARING ON THIS MOTION ONLY IF THE COURT DEEMS IT NECESSARY.**

VENTURE TAPE CORPORATION

By its attorneys,


/s/ Christopher J. Cunio
Christopher J. Cunio, BBO # 634518
Jaimie A. McKean, BBO # 657872
COOLEY MANION JONES LLP
21 Custom House Street
Boston, MA 02110
Tel. (617) 737-3100

DATED: August 9, 2006
163528

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiff's Memorandum in Support of its Motion for Damages was served by first class mail this 9th day of August, 2006 upon the following:

Hodges Brown, Jr., Esq.
H. Brown & Associates
600 Columbia Road
Suite 103
Boston, MA 02125-3421

Don Gallagher
7121 Radford Avenue
North Hollywood, CA 90615

/s/ Christopher J. Cunio
Christopher J. Cunio